**UNITED STATES DISTRICT COURT**
**DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:25-cr-00020-RRB-SAO |
| Plaintiff, | **REPORT AND RECOMMENDATION[1]** |
| vs. | **REGARDING DEFENDANT'S** |
| | **MOTION TO SUPPRESS** |
| VINCENT LAWRENCE ROBERTS, | **EVIDENCE AND STATEMENTS** |
| Defendant. | **(Docket 33)** |

## I. INTRODUCTION

Defendant, Vincent Lawrence Roberts, was indicted on two counts of Possession With Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii); One count of Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Defendant filed a Motion to Suppress Evidence and Statements on February 26, 2026.[2]  The government filed an opposition on March 10, 2026.[3]  Defendant seeks suppression of all evidence obtained by law enforcement on December 28, 2024, and Defendant's statements made following his apprehension and detention after the December 28, 2024, search and seizure.

The court held an evidentiary hearing on the motion on April 2, 2026.[4]  Written arguments were requested and filed on April 20, 2026.[5] At the evidentiary hearing, the court heard the

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.
[2] Docket 33.
[3] Docket 38.
[4] Docket 63, transcript.
[5] Dockets 66 and 67.

testimony of Alaska State Trooper (Investigator) Donald Ridge. The court also considered the video footage from December 28, 2024. Government Exhibit 2. The court did not consider the additional reports attached to government pleadings marked as Government Exhibit 1 for Identification. The Defendant did not testify.

The Defendant's motion is now ripe for consideration. For the reasons below, the Court RECOMMENDS the Motion to Suppress Evidence and Statements at Docket 33 be DENIED.

## II. STATEMENT OF FACTS

Alaska State Trooper (Investigator) Donald Ridge[6] was on patrol in Anchorage in a marked patrol vehicle on the evening of December 28, 2024. He received a complaint through dispatch reporting a dangerous or reckless driver. At that time, it was dark outside with temperatures well below freezing and a light breeze.  The complaint described a black sedan, license plate number, and distinctive characteristics of the vehicle. The report stated the vehicle was driving at varying speeds, shifting from side to side, and almost hit a guard rail. A witness following the vehicle described that the vehicle had pulled into the parking lot of an IHOP restaurant.

Ridge went to the IHOP restaurant and spotted the vehicle in the nearly empty parking lot. He identified the vehicle by its location, color, description, and license plate. The vehicle was parked with its nose in, facing the highway, near an overhead light pole. As he pulled into the parking lot he could see a person in the driver's seat through the front windshield and another individual in the back seat. Ridge made a U-turn behind the vehicle, parking about thirty feet back

---

[6] Ridge was a patrol Sergeant for eight years with the Alaska State Troopers who previously retired with over twenty years of service from the Wasilla Police Department.

2

and offset from the parked vehicle. His emergency lights were off but his headlights were on. Ridge exited his vehicle and began to walk towards the driver's side.[7] Ridge saw the driver move from the driver side to the passenger side and Ridge knocked on the window.

Almost immediately, the rear seat passenger door opened and the passenger exited the vehicle and started talking to Ridge. Ridge asked him who was driving. The individual denied he had been driving and did not otherwise answer the question. The passenger said they were waiting for somebody, so Ridge asked repeatedly "Who drove there?" and the passenger would not answer him. Ridge then told the individual to walk away and stand off to the side.

Ridge then turned his attention to the individual in the front seat of the vehicle. Ridge knocked on the passenger side front window, the man in the front seat opened the front car door but remained seated. [The individual in the front seat of the vehicle was later identified as Vincent Roberts, the Defendant.] Ridge first asked "Are you ok?" and Defendant replied "Yes." Ridge asked him why he had switched to the passenger seat and the Defendant stated he was going to lay down. Ridge then asked the Defendant a series of questions.   Defendant first stated he did not have any identification, but subsequently said he did have ID but was not able to produce it. He provided his first name, last name, and date of birth.  Ridge asked Defendant where he had driven from, but Defendant did not respond.  Ridge asked Defendant if he was tired, which Defendant acknowledged.  Ridge called in Defendant's name and date of birth into his dispatcher. While doing so, Ridge relayed an incorrect birth date and Defendant corrected him. Ridge asked Defendant the passenger's name and Defendant replied "ask him."

---

[7] The interactions are depicted in the dashcam video from Government Exhibit 2.

3

The dispatcher told Ridge that the Defendant did not have a valid license because it was suspended. Ridge then asked Defendant if he was hurt or injured in any way. Defendant said no. Ridge asked Defendant if he had a valid driver's license and he said "suspended."[8] Defendant said he had family members coming to meet him there. Ridge again asked where he had driven from and he said, "over there," indicating across the roadway. Ridge asked why he had driven. Ridge asked again if he had been hurt or injured in any way, if he had any emergency or illness, if he was using any drugs/marijuana, or was diabetic or epileptic. Defendant denied all and indicated he was ok. During this interaction, Defendant acted in a peculiar manner. He leaned back, reached around, reached in and around his pockets, and made quick movements multiple times. Ridge told him not to move in this manner, but he continued doing so.[9] Ridge then asked him how much he had to drink that evening and he said none. At one point while they were talking, the Defendant reclined his seat and laid down while the two were speaking.

Ridge told the Defendant he was going to ask him to get out of the car to see if he was physically ok to have been driving. Ridge asked him if he had any weapons on him whatsoever and Defendant responded "No." Ridge told Defendant several times he was going to be checked for weapons and that he should keep his hands where they could be seen.[10] As Ridge spoke to

---

[8] Evidence and Testimony were unclear whether Ridge first learned that Defendant's license was actually suspended from the dispatcher or Defendant directly. Regardless, Defendant readily volunteered the information when asked.

[9] Regarding Defendant's actions, when defense counsel suggested Defendant was moving around the vehicle in order to locate his identification card, Ridge testified "The movements where someone knows where their driver's license or ID is at is usually pretty deliberate. This was not something normal that I would expect someone to do knowing they're looking or reaching for their driver's license. The movements were quick, furtive, leaning away from me, reaching into different places but not looking – not spending time looking for something." Transcript at 23.

[10] At this point, due to the Defendant's behavior, even after he had been told to relax and the behaviors not stopping, Ridge was concerned for his safety in that the Defendant might be reaching for a weapon or trying to hide something or reach for something else.

4

the Defendant, the Defendant continuously and repeatedly leaned away from him. The Defendant turned back into the vehicle so Ridge told him not to do that in a raised voice. Ridge grabbed the Defendant's right arm to move him out of the car. As Defendant moved away, back toward the interior of the vehicle, Ridge told Defendant to stop moving and stop pulling. When Ridge raised his voice louder to tell Defendant to stop, Officer Hellman, now on the scene, raced over to help hold the Defendant still so he could be stood up and patted down.[11]

Defendant stood up and Ridge started patting him down. At that time, Officer Hellman asked Defendant if he had any knives or guns on him and Defendant said no. While the pat-down continued, Ridge asked dispatch for a photograph of the Defendant. Officer Hellman assisted in steadying the Defendant while Ridge conducted the pat down. At one point Ridge stopped and told the Defendant that "When you keep reaching it makes people think you are reaching for something." Ridge paused again and told Defendant he was just checking him for weapons.

Ridge identified a rectangular object in one of the Defendant's pants pockets, he believed it could have been a small pocketknife. However, Ridge was not concerned about it enough to remove it from Defendant's pocket at that time. In another pocket, Ridge identified a pocket-sized item which had a granular and crunchable texture. Based on his career experiences, Ridge immediately believed the item, based on its texture, size, and consistency, was a bag of methamphetamine. Ridge could not confirm it was methamphetamine as he left it in the pocket, but he knew it was not a weapon. Because Ridge ascertained he was not in any immediate danger

---

[11] Officer Hellman and a third officer had also arrived on the scene by this point. The third officer primarily watched the passenger.

5

of weapons he continued his investigation of the Defendant for potentially driving under the influence.

Once the pat down was completed Ridge told the Defendant he had received a complaint of bad driving. He asked Defendant if there was any reason for the bad driving. Defendant responded that he was tired. Ridge then asked him again why he was constantly reaching around. Ridge told him "You don't have a license… but that's not a big deal." Defendant replied "or insurance" and Ridge said "we're going to leave that alone for now."[12]

Officer Hellman continued to shine his flashlight into the front and rear of the vehicle. Ridge told Defendant to step behind the car, and Defendant complied.[13] Just as the Defendant arrived at the rear of the vehicle to begin the field sobriety tests ("FSTs"), Officer Hellman told Ridge "There's a handgun in the back," having spotted the handgun resting on the middle, but towards the front, of the rear bench seat. The firearm had been within arms' reach of the Defendant when he was in the vehicle. Ridge did not know of the handgun until Officer Hellman told him about it.

Ridge then asked Defendant, "Is this your car?" Defendant replied "no, it's my friend's car." Officer Hellman then told Ridge he also saw a bottle of vodka in the vehicle. Ridge asked Defendant again whether he'd consumed alcohol, which Defendant denied. Defendant complied as Ridge administered the Horizontal and Vertical Gaze Nystagmus tests. Ridge decided at that

---

[12] Government Exhibit 2, dashcam video.
[13] At this point, approximately eight minutes had elapsed after Ridge pulled up behind Defendant's vehicle.

6

time not to continue the investigation for driving under the influence. Ridge told Defendant "I don't think you've been drinking…but why did you get all squirrelly?"[14]

Ridge told Defendant "Based on the complaints and your actions, I had to see if you were ok to drive." Ridge then said "But you had some other things in your pockets…how about your ID? Let's check for your ID." Defendant commented that his identification was in his wallet somewhere in the car.[15] Defendant started to step back toward the interior of the car and Ridge had to tell him he could not let him back in the car because there was a firearm in the car. Ridge asked Defendant if he could have another officer retrieve the wallet from inside the car. While this occurred Officer Hellman walked around the car with his flashlight to see if he could see a wallet. Ridge asked other officers to access a photograph of the Defendant as they still had not confirmed Defendant's identity.

During this time Defendant continued to make movements; shifting his stance, flexing his knees, checking his pockets, adjusting his coat, pulling on his hoodie, looking away from Ridge, and looking around him. Ridge adjusted his stance several times because he believed the Defendant was going to either run or fight or hide something. Ridge did not interpret Defendant's behaviors as monitoring the other officers or trying to locate his wallet. Ridge told the Defendant "you're just moving around too much" or words to that effect and decided to put Defendant in

---

[14] Government Exhibit 2, dashcam video.

[15] Ridge testified that throughout the encounter Defendant told him his ID was "in his wallet in the car, but somewhere never specifically said, but he also said it was in his car or pants." Trans. at 40. Defendant's briefing indicates that he indicated that his ID was in "his Carhart pants." Docket 33 at 9. Ultimately, the wallet was found under the Driver's seat.

7

handcuffs to detain him and prevent him from running off. While he was applying the handcuffs dispatch informed them that the Defendant had felony convictions.[16]

Ridge did not tell Defendant at this point that he was under arrest, however Ridge felt at this point that Defendant "was going to be arrested."[17] Ridge testified that he knew the Defendant had methamphetamine on him, but that Ridge was still holding him to also confirm Defendant's identity with an ID Card or photograph. Ridge stated he was going to place the Defendant in the back of his patrol car until they could get some identification. Defendant replied that his identification was in his wallet in the car. Ridge then told Defendant he knew he had a felony conviction and the firearm in the car and "could not have that."[18]

Ridge moved Defendant to the front of his patrol car and then searched him. During the search, Ridge went into Defendant's pockets and removed items. Ridge identified the pocketknife he had suspected and placed it on his vehicle. Defendant confirmed it was his knife. Ridge told the Defendant to stand still when the Defendant moved during the search.

Ridge removed the crunchable substance from the Defendant's pocket. Ridge commented "That's a lot of meth" and Defendant immediately replied "that's not much."[19] Continuing the search, Ridge then removed a larger bundle of methamphetamine from his pocket and said "That's a whole lot of meth."[20] Ridge identified it as approximately five ounces of methamphetamine. Ridge continued the search and again told the Defendant to stand still. Ridge

---

[16] At this point, approximately eleven minutes had elapsed after Ridge pulled up behind Defendant's vehicle.
[17] Transcript at 34.
[18] Government Exhibit 2, dashcam video.
[19] *Id*.
[20] *Id*.

8

then told the Defendant "You're under arrest"[21] for the methamphetamine. Ridge did not arrest Defendant for being a felon in possession of a firearm or driving on a suspended license. Defendant replied "Yeah, yeah" and then said "Illegal search and seizure?" Ridge explained "You're required to identify yourself and you didn't have any identification on you." Defendant responded "My identification was right there" indicating to the vehicle. Ridge continued the search and confirmed whether the passenger had been detained.

Ridge placed Defendant in the back seat of his patrol vehicle. Ridge and other officers looked at the Defendant's DMV photo provided by dispatch and detailed information and confirmed it was the Defendant. At this point Ridge reviewed Defendant's prior felony convictions including one from 2016 for criminal mischief in the third degree, which is a Class C felony in the state of Alaska. Other officers on scene relayed that they saw what appeared to be methamphetamine in the vehicle, near the handgun, and several alcohol bottles. Officers collected the evidence. It was discovered that the 9mm handgun on the back seat had a round in the chamber. Officers walked around the vehicle after Defendant's arrest and saw several baggies near the Vehicle Identification Number on the front left of the dashboard.

Ridge approached Defendant while still on the scene and asked him if he had anything else on him because he was being transported to jail. Ridge then advised Defendant of his rights. The Defendant acknowledged his rights and said he did not want to talk. Ridge then transported Defendant to jail where a search found two 9mm bullets, a gram and a half worth of cocaine and an empty syringe. The bullets matched the caliber of the pistol found in the vehicle. Officers later

---

[21] At this point approximately thirteen minutes had passed since Ridge had pulled behind the Defendant's vehicle.

9

obtained the search warrant for the vehicle where they found the Defendant's wallet under the driver's seat which had the Defendant's state identification card.

### III. DISCUSSION

Defendant primarily argues that prolonging Defendant's traffic stop, from when Ridge concluded his FSTs of the Defendant through Defendant's detention in handcuffs and the detailed search in front of Ridge's patrol vehicle, was illegal.[22]  The Government argues "the traffic stop was not unlawfully prolonged because officers had reasonable suspicion to investigate newly suspected crimes requiring a continuation of their investigation."[23] The court concludes Ridge's extension and detention of Defendant through his arrest was not unlawful for multiple reasons.

Defendant's argument concedes that law enforcement's actions  from first contact with the Defendant through Ridge's administration of the FSTs were lawful.[24]  As Defendant explains, following initial contact and prior to administering field sobriety tests, a *Terry* pat search for weapons was warranted.[25]  The undersigned concurs that all the events that occurred prior to Ridge administering the FSTs to the Defendant on December 28, 2024, were lawful.

However, Defendant then argues that:

> [W]hen Sergent Ridge "did not see any apparent signs of intoxication [or] impairment . . . [and elected to] not further investigate [Roberts] for driving under the influence-" any reasonable suspicion related to a possible DUI dissipated. Moreover, any concern about Roberts possessing a weapon were alleviated by Ridge's initial pat search and conclusion that Roberts was unarmed.

[22] Docket 33.
[23] Docket 38 at 7.
[24] Docket 33 at 9.
[25] Docket 33 at 9.

With reasonable suspicion of a DUI offense dissipated, the stop should have ended fairly quickly. Ridge could have cited Roberts for driving without or on a suspended license, or elected to simply advise Roberts not to drive away as the car was parked in a parking lot and no longer being driven. Ridge instead started a new investigation related to suspected contraband he felt in Roberts' pockets during the much earlier pat search.[26]

Defendant argues that in order "[t]o justify prolonging the traffic stop, Ridge needed *additional* reasonable suspicion of new or different wrongdoing than that justifying his original stop."[27] He argues that once Ridge determined that there were no apparent signs of intoxication or impairment, the purpose or mission of the initial stop was completed.[28] Moreover, argues Defendant, the officers concluded that Roberts was not armed. Having confirmed his identity with his date of birth and the DMV file picture provided by Dispatch, Defendant argues that "no further investigation of his identity or driving status was to be furthered by another search of his person."[29]

But the Court agrees with the Government's argument that the traffic stop "was not unlawfully prolonged because officers had reasonable suspicion to investigate newly suspected crimes requiring a continuation of their investigation."[30] During the initial pat down, Ridge identified what he strongly believed to be methamphetamine in Defendant's pocket. As Defendant's troubling movements continued during the pat down, Ridge proceeded with the FSTs. But before even starting the FSTs, Ridge also learned that Defendant drove the vehicle without car insurance, that he had a handgun within reach on the backseat, and that there was

---

[26] Docket 33 at 9.
[27] *Id*., citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).
[28] Docket 33 at 10.
[29] *Id*.
[30] Docket 38 at 7.

11

a bottle of Vodka in the back seat. These additional circumstances created reasonable suspicion of newly suspected crimes requiring additional investigation contradicting defense's assertion that "Like here, in *Askew*, police conducted a *Terry* frisk which produced nothing."[31]

Even setting aside that Ridge was not pursuing an investigation of the Defendant for driving with a suspended license, law enforcement was still looking for Defendant's identification because he had driven the vehicle and a gun remained on the backseat. During the few minutes from the conclusion of the FSTs through handcuffing of the Defendant, law enforcement was waiting to hear from their dispatcher whether the Defendant had a felony conviction. "Officers are generally allowed to continue a traffic stop long enough to request the driver's documents, and doing so does not unreasonably prolong the seizure under the Fourth Amendment."[32] While not argued by the parties, the court finds *U.S. v. Hylton*, supports this point.[33] *Hylton* flatly holds that because a criminal history check "stems from the mission of the stop itself," it is a "negligibly burdensome precaution[ ]" necessary "to complete [the stop] safely."[34] Applying *Hylton* to our facts justifies the additional investigation time needed from the FSTs to identification of the Defendant's criminal history before releasing him into the vehicle with the gun.

Examining *Hylton's* application of the doctrine of inevitable discovery[35] to our case provides additional justification for Defendant's detention past the completion of the FSTs. *Hylton* states:

---

[31] Docket 67 at 6, citing *U.S. v. Askew*, 529 F.3d 1119, 1140 (D.C. Cir. 2008).

[32] *U.S. v. Nault*, 41 F.4th 1073, 1080 (9th Cir. 2022).

[33] 30 F.4th 842 (9th Cir. 2022).

[34] *Id*. at 848.

[35] The well-established rule of inevitable discovery rule is an exception to "[t]he doctrine requiring courts to suppress evidence as the tainted 'fruit' of unlawful governmental conduct." *Nix v. Williams*, 467 U.S. 431, 441 (1984). It applies

Here, the officers discovered the gun during the part of the stop that Hylton concedes was lawful, before any alleged prolongation began. The district court reasoned that even if the officers had returned the gun and ended the stop before the criminal history check was completed, they still would have discovered that Hylton was a felon only two minutes later. At that point, the officers would have concluded that Hylton was a felon in possession of a gun (in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)) and would have pulled him over again and seized the gun.[36]

*Hylton's* facts are very similar to those in our case and would have produced a similar result. If Defendant had been cited and released immediately following completion of the FSTs, presumably with the passenger driving the Defendant in their vehicle, law enforcement would have discovered that he had been a felon in possession of a firearm within minutes. Similar to *Hylton*, law enforcement would have had to pull him over again and seize the gun.

Lastly, the court tends to agree with the Government's argument that law enforcement's actions with the Defendant were delayed due in part to Defendant's own actions and movements when evaluating the length of law enforcement's interactions with the Defendant. These actions included that Ridge had to place the Defendant into handcuffs to briefly extend the traffic stop after the conclusion of the FSTs. The facts show that Defendant's actions interfered with executing the initial pat-down, and his movements both during the pat-down and during his detention lengthened his encounter with law enforcement at each stage.

---

if, by "following routine procedures, the police would inevitably have uncovered the evidence." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009) (internal quotation omitted). *Cited by Hylton,* 30 F.4th at 848.

[36] *Hylton*, 30 F.4th at 848. The court recognizes law enforcement suspected the gun in *Hylton* had been used in a bank robbery, while law enforcement in our case did not suspect that the gun itself had been used in a crime or was stolen. Regardless, after it was clear our Defendant was a felon who had been within arm's reach of a gun there was probable cause to believe he had committed the offense of being a Felon in Possession, in violation of 18 USC § 922(g)(1).

13

Because of the additional bases for investigation discovered before conclusion of the FSTs, the necessity of continuing the detention of the Defendant to learn of his criminal history, and his role in extending the length of the detention, the court does not find law enforcement's extended detention and search of the defendant to be unlawful. For this reason, the court further does not find a basis to suppress the Defendant's statements made to law enforcement on December 28, 2024.

## IV. CONCLUSION

For the foregoing reasons this Court recommends the Defendant's Motion to Suppress Evidence and Statements at **Docket 33** be DENIED. IT IS SO RECOMMENDED.

DATED this 4th day of June, 2026, at Fairbanks, Alaska.

s/ *SCOTT A. ORAVEC*
SCOTT A. ORAVEC
United States Magistrate Judge

A party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court for consideration by the United States District Court Judge, the Honorable Ralph R. Beistline, **on or before 4:00 p.m. on June 10, 2026.** The parties shall otherwise comply with provisions of Local Magistrate Rule 6(a). The failure to object to a Magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.[37] The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a Magistrate judge's recommendation.[38] Objections shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.[39]

---

[37] *McCall v. Andrus*, 628 F.2d 1185, 1187-1189 (9th Cir.), *cert. denied*, 450 U.S. 996 (1981).
[38] *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).
[39] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).

14